IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:20-CT-03164-M

CORNELIUS BARNES,)
)
Plaintiff,)
)
v.)  ORDER
)
RONNIE INGRAM, et al.,)
)
Defendants.)

This case comes before the court on plaintiff's motions for summary judgment, Mot. [D.E. 83], to amend the relief sought, Mot. [D.E. 98], and to expedite, Mot. [D.E. 99], Mot. [D.E. 100], and defendants' motion for summary judgment, Mot. [D.E. 90]. These motions are ripe for review.

Relevant Procedural History

On May 11, 2020, Cornelius Barnes ("plaintiff"), then a state pretrial detainee proceeding without prepayment of fees, filed *pro se* a complaint under 42 U.S.C. § 1983. See [D.E. 1, 2, 8].

Plaintiff generally alleges Sheriff Ronnie Ingram ("Ingram"), Captain Robert Daugherty ("Daugherty"),[1] Corporal Kayla Foster ("Foster"), and Major Ryan Dawson ("Dawson"), violated his Fourteenth Amendment rights at the Lenoir County Jail ("the Jail"). Compl. [D.E. 1] at 3–7; [D.E. 15] at 1. Plaintiff specifically alleges, on September 11 and 29, 2019, and on March 17 and 23, 2020, Foster cited him for disciplinary infractions. Compl. [D.E. 1] at 5. Plaintiff

---

[1] This defendant was previously misidentified as "Captain Daughtry." The court DIRECTS the clerk to update the docket to reflect defendant's correct name as Robert Daugherty.

states: "I was restricted from visits, phone calls, recreation, canteen, and I was confined to a cell for 24hrs for 15 day for each incident [sic]." Id. at 6. Plaintiff contends he did not receive a hearing when these restrictions were imposed. Id. at 5. Plaintiff alleges he wrote a grievance, but Daugherty "responded that 'hearings are not for rule violations and this facility follows its own rules,'" and his grievance appeal to Dawson received the same response. Id. Plaintiff states Ingram is "Sheriff over the jail." Id. Plaintiff seeks damages and declaratory relief. Id. at 8.

On January 12, 2021, the court, *inter alia*, conducted its initial review, dismissed without prejudice Foster as a defendant, and allowed plaintiff's Fourteenth Amendment due process claims to proceed against defendants Ingram, Dawson, and Daugherty. Order [D.E. 17].

On March 19, 2021, these remaining defendants moved to dismiss the complaint for failure to state a claim, Mot. [D.E. 31], and filed a memorandum in support, [D.E. 32]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiff of this pending motion to dismiss, the response deadline, and the consequences of failing to respond. [D.E. 33]. Plaintiff timely filed a response in opposition. [D.E. 38].

On June 7, 2021, the court, *inter alia*, denied as premature the parties' motions for summary judgment, and denied plaintiff's motions for judgment on the pleadings. Order [D.E. 65].

On February 17, 2022, the court, *inter alia*, granted in part the motion to dismiss as to plaintiff's request for declaratory relief, and as to the claims against Ingram, but denied the motion in other respects, and dismissed without prejudice Ingram as a defendant. Order [D.E. 72].

On March 2, 2022, Dawson and Daugherty ("defendants"), filed an answer. [D.E. 75].

On April 26, 2022, plaintiff moved for summary judgment, Mot. [D.E. 83], and filed a memorandum in support [D.E. 84], a statement of facts [D.E. 85], and an appendix [D.E. 86].

2

On May 17, 2022, defendants moved for summary judgment, Mot. [D.E. 90], and filed a memorandum in support of their motion and in opposition to plaintiff's motion for summary judgment [D.E. 91], a statement of material facts [D.E. 92], and an appendix [D.E. 93]. Pursuant to Roseboro, 528 F.2d at 310, the court notified plaintiff about defendants' motion for summary judgment, the response deadline, and the consequences of failing to respond. [D.E. 94].

On May 31, 2022, plaintiff filed a response in opposition. [D.E. 96].

On July 14, 2022, plaintiff moved to amend the relief requested. Mot. [D.E. 98].[2]

On August 22 and November 14, 2022, plaintiff moved to expedite. See [D.E. 99, 100].[3]

## Facts

The facts are disputed as noted. Plaintiff was detained at the Jail from September 7, 2018, to December 1, 2020. Defs.' Stmt. Mat. Facts [D.E. 92] at ¶1. The Jail "has two jail facilities; the 'old jail' located beneath the Lenoir County Courthouse and the 'new jail' located adjacent to the Lenoir County Courthouse."[4] Id. at ¶2. Plaintiff was housed with the general population in

---

[2] Although plaintiff requires leave to amend, see Fed. R. Civ. P. 15(a)(2), the amendment sought revises the relief requested, compare Compl. [D.E. 1], with Mot. [D.E. 98], and is not futile, see Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). Thus, the court GRANTS the motion [D.E. 98], but defendants need not further answer.

[3] Because plaintiff's motions to expedite adjudication of the parties' pending motions for summary judgment are mooted by the instant order, the court DENIES AS MOOT these motions [D.E. 99, 100].

[4] Defendants assert: the 'new jail' houses the inmate general population in dorms in pods A, B, C, and D; the 'old jail' houses the inmate general population in B, C, D, and E blocks"; "The 'old jail' is also the location of J block, which is where the disciplinary segregation cells or solitary confinement are located." Defs.' Stmt. Mat. Facts [D.E. 92] at ¶2. Plaintiff asserts: "inmates are locked down in every dorm in the new jail and old jail for disciplinary and inmates are locked downstairs in J-Block solitary unit for disciplinary." Pl.'s Stmt. Disputed Facts [D.E. 96] at ¶2.

3

B pod in the "new jail" when the September 11 and 29, 2019, and March 16 and 23, 2020, incidents occurred, but the parties disagree as to the details.[5] Id. at ¶¶3–4.

The Jail's "Inmate Orientation Manual" sets forth written rules, policies, and procedures that apply to the inmates and the jail staff, provide for inmate discipline, and allow for a hearing for certain infractions. Id. at ¶¶5–9. The parties disagree whether plaintiff was entitled to a hearing as to the incidents on September 11 and 29, 2019, and March 16 and 23, 2020,[6] and whether other aspects of his disciplinary history at the jail are relevant to the instant action.[7]

Plaintiff's claims arise from infraction citations by Foster dated September 11 and 29, 2019, and March 17 and 23, 2020. Id. at ¶12. These four incidents are described as follows:

> On September 11, 2019, Cpl. Foster was doing a walk in B-Pod when Barnes slid a grievance form on the side of his cell door. When Cpl. Foster grabbed the form, Plaintiff was masturbating. He was determined to be in violation of the prohibition

---

[5] Defendants assert that, at times relevant to this case, plaintiff was housed with the general population in B pod in the "new jail," and was not transferred to solitary confinement. Defs.' Stmt. Mat. Facts [D.E. 92] at ¶4. Plaintiff asserts that: "Plaintiff on September 11 and 29, 2019[,] was placed on lockdown and March 16 and 23, 2020[,] was placed on lockdown in the cell were [sic] he could not come out for rec., couldn't use the phone, couldn't get visits and was not allowed canteen." Pl.'s Stmt. Disputed Facts. [D.E. 96] at ¶4.

[6] Defendants assert: the "Inmate Orientation Manual" identifies inmate privileges including visitation, telephone use, and commissary services; as to discipline, "inmates can receive different types of sanctions depending on the nature of their infractions"; and the "Inmate Orientation Manual" provides a hearing with a Hearing Officer when an infraction results in the inmate's "placement in more secure housing, loss of property, or loss of any constitutional right." Defs.' Stmt. Mat. Facts [D.E. 92] at ¶¶6, 8, 9. Plaintiff asserts: "telephone, visitation, and rec. are a pretrial detainee's constitutional rights and not privileges given to him by the jail but the jail is required by law to give the pretrial detainee these rights"; he received the same sanctions regardless of the infraction; he was not given a hearing for any infraction he received; the jail does not have a hearing officer to conduct hearings; and he requested a hearing in writing and verbally for the punishment imposed on him. Pl.'s Stmt. Disputed Facts. [D.E. 96] at ¶¶6, 8, 9.

[7] Defendants note other instances where plaintiff's conduct was found to have violated policy or otherwise caused "operational, security, and administrative concerns." Defs.' Stmt. Mat. Facts [D.E. 92] at ¶¶10–11. Plaintiff asserts that these other incidents are irrelevant to the instant action. Pl.'s Stmt. Disputed Facts. [D.E. 96] at ¶¶10–11.

4

on indecent exposure and disrespecting staff. The shift supervisor placed Barnes on lockdown status for 10 days and the privileges related to visitation, recreation time, telephone, and commissary were restricted.

On September 29, 2019, Barnes stated that the lights in his cell were a high intensity beam and that the jail was violating his personal rights. Barnes covered the light in his cell and refused to uncover them when directed to do so. He was determined to be in violation of the prohibition on covering windows or lights and failure to obey and follow orders. The shift supervisor placed Barnes on lockdown status for 10 days and the privileges related to visitation, recreation time, telephone, and commissary were restricted.

On March 16, 2020, Cpl. M. Washington entered B-pod to conduct a head count where Barnes began cursing, yelling, and threatening Cpl. M. Washington. Barnes began saying things like: "suck my d*ck," "I'm gonna f*ck you in your butt when I come home," I'm gonna get you when I get home because I don't have long," f*ck you stupid b*tch," etc. When Cpl. M. Washington conducted another walkthrough, she asked Cpl. Foster to monitor her. Barnes started yelling, cursing, and threatening her again. Barnes was already on lockdown status at the time and that status was extended for violations, including disorderly conduct, use of profane language, and threats against staff. His privileges related to visitation, recreation time, telephone, and commissary were restricted. When Cpl. Foster subsequently went inside B-Pod to give Barnes his lockdown papers, Barnes came to his cell door naked and refused to put on clothes when asked.

On March 23, 2020, at 2:00am, Cpl. Foster was doing a walkthrough in B-Pod. Barnes was laying on his mat naked masturbating. Barnes was determined to be in violation of the prohibition on indecent exposure. The shift supervisor issued an additional 15 days of lockdown status and restricted the privileges of visitation, recreation time, telephone, and commissary. Subsequently at 10:15pm, Cpl. Foster was passing out razors inside B-pod and when she got to Barnes' cell[,] he was standing at the door naked masturbating. The shift supervisor extended Barnes' restrictions by 15 days.

Id. at ¶13.

5

Restrictions were imposed on plaintiff due to these incidents, but the parties disagree as to the personal involvement of defendants,[8] and the contours of plaintiff's lockdown status.[9] The parties also disagree whether the restrictions imposed were a loss of "privileges" or a "punishment" that necessitated a hearing.[10]

---

[8] Defendants state: "Those infractions and related loss of privilege were related to Plaintiff's rule violations"; the restrictions were not imposed by defendants; and "plaintiff lost privileges including access to visitation, limited access to the jail commissary/canteen, and limited access to phone calls." Defs.' Stmt. Mat. Facts [D.E. 92] at ¶¶13–15. Plaintiff states: punishment was imposed pursuant to these disciplinary reports; "defendants were made aware of [his] complaints about punishing him without giving him a hearing through letters and grievances"; "defendants are the only officials at the jail who could give plaintiff a hearing"; and both defendants informed him "no hearing will be given to him" and "this jail follows its own rules"; and "plaintiff lost his right to visits from family and friends, phone calls to family and friends, and plaintiff was segregated in his cell and was not allowed to have rec. period being held in his cell 24 hours a day." Pl.'s Stmt. Disputed Facts. [D.E. 96] at ¶¶13–15.

[9] Defendants state, in relevant part: "While plaintiff was placed on lockdown status where his movement outside his cell was restricted, [he] was not moved to more secure housing, commonly known as disciplinary segregation or 'solitary confinement,' as a result of any the incident dates identified" in the complaint; "Instead, [he] remained in general population housing, could interact with other inmates, could watch television, and was provided designated periods to shower"; "At no time relevant to the incidents identified in Plaintiff's Complaint was he transferred to solitary confinement or kept in a cell for 24 hours for 15 straight days." Defs.' Stmt. Mat. Facts [D.E. 92] at ¶¶16–18. Plaintiff states, in relevant part: "Being confined to his cell for 15 days each incident for 24 hours with no rec. is considered segregation and solitary confinement, no matter the location in the jail"; he "remained in a cell for lockdown, that he was not allowed to leave for 24 hours a day"; "if he could not leave the cell, how could he possibly interact with inmates"; and "[a]t the times relevant the plaintiff was held in a cell for 24 hours a day and only let out to take a shower once every 72 hours or 3 days." Pl.'s Stmt. Disputed Facts. [D.E. 96] at ¶¶16–18.

[10] Defendants state: "Because plaintiff's rule violations resulted in loss of privileges, and not placement in solitary confinement, loss of property, or loss of any constitutional right, [he] was not entitled to a hearing" under the "Inmate Orientation Manual"; the jail staff and administrators followed policies and procedures giving plaintiff notice of his infractions and access to grievance process; Cpl. Foster provided plaintiff notice of his rule violation and her shift supervisor determined what restrictions would be applied as a result of the infractions; and Ingram, Dawson, and Daugherty were not personally involved with any infraction or restricting plaintiff's privileges, "including with respect to the four incident dates" at issue in this case. Defs.' Stmt. Mat. Facts [D.E. 92] at ¶¶19–22. Plaintiff states: he was not "given a hearing to dispute the allegations, to have an [unbiased] factfinder determine if they were true or false [sic]"; "this

6

The parties agree that: Daugherty is the grievance officer and jail administrator; grievances may be filed with Daugherty who investigates and provides a written response; if an inmate is dissatisfied with Daugherty's decision, the inmate may appeal to Dawson; and, in April 2020, plaintiff filed a grievance with Daugherty stating he was entitled to a hearing for the disciplinary infractions he received. Id. at ¶¶23–25. The parties, however, disagree why plaintiff was in solitary confinement at that time and whether Daugherty's grievance response was proper.[11]

The parties also agree that, on April 29, 2020, pursuant to the grievance policy, plaintiff appealed Daugherty's response to Dawson, and that Dawson's response on May 1, 2020, stated:

---

confinement for 24 hours to a cell was imposed as punishment and not being able to call or have visits from family is punishment triggering the need for a hearing"; "The jails policy is not what establishes plaintiff right, the law requires that a hearing be given to a detainee once punishment is established"; plaintiff was entitled to a hearing; "Corporal Foster gave notice of the charges to the shift Sgt. and refers sanctions [sic], Sgt. agreed, imposed the sanctions and Corporal Foster carried out the punishment by restricting plaintiff to the cell, not allowing him to have visits, and not allowing him to use the phone [sic]"; and that Dawson and Daugherty, "as the jail administrators, denied plaintiff the hearing required by law," and when plaintiff appealed, asserting that he had received inadequate due process, both defendants said "no hearing will be given to the plaintiff" and "hearings are not for rule violations." Pl.'s Stmt. Disputed Facts. [D.E. 96] at ¶¶13, 17, 19–22.

[11] Defendants state: "Plaintiff was in solitary confinement for incidents unrelated to the incidents identified by Plaintiff in his Complaint"; on April 16, 2020, Daugherty "responded and informed Plaintiff that he had failed to request a hearing when he was transferred to secure housing for an unrelated incident"; and, on April 17, 2020, Daugherty "responded to another grievance from Plaintiff and stated that jail personnel follow the facility rules for hearings and disciplinary procedures." Defs.' Stmt. Mat. Facts [D.E. 92] at ¶¶26–28. Plaintiff, by contrast, states: "At the time the Plaintiff filed the grievance with [Daugherty] and Dawson[,] he was in solitary confinement for the incident relevant to March 23, 2020 and March 16, 2020. He finished the disciplinary for those sanctions May 11, 2020"; the Inmate Orientation Manual states, when an inmate is transferred to solitary confinement, he will be given a hearing; the only way to waive the hearing is by pleading guilty; plaintiff, however never had a hearing nor received documents to waive his right to a hearing; Daugherty and Dawson "refused to give the plaintiff a hearing when he requested it" and did not follow the policy when he was moved to solitary confinement; and Daugherty's response did not align with the Inmate Orientation Manual. Pl.'s Stmt. Disputed Facts. [D.E. 96] at ¶¶26–29.

7

> No hearings will be conducted for these actions. [Privileges] are not constitutional rights. Hearings are not conducted for any rule violation that results in sanctions for loss of [privileges]. This information is written in our inmate orientation manual. In the future, please follow the rules [and] guidelines of our detention facility to avoid loss of privileges.

Id. at ¶¶30–31.

The parties disagree whether plaintiff's history of rule violations was considered when restrictions were imposed. Compare id. at ¶33, with Pl.'s Stmt. Disputed Facts. [D.E. 96] at ¶33.

## Legal Standards

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Rules of Civil Procedure."

Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

## Arguments

In support of his motion for summary judgment, plaintiff argues that the Jail sanctions were imposed with the express intent to punish him, but he did not receive the requisite due process protections. Pl.'s Mem. [D.E. 84] at 6. Plaintiff reiterates that, "after two different 'altercations [sic]' he was placed in 24-hour lock-down for a total of ten days each and lost privileges such as social calls, visitation, and canteen." Id. at 9. Plaintiff argues he was entitled to a hearing, defendants acknowledge no hearing was given, and that, despite filing "a grievance against the denial of this vital right [sic]," the "head official [sic] responded back to [him,] 'no hearings are given for disciplinary[,]' 'the jail follows its own rules[,]' and 'no hearing will be given to the plaintiff [sic].'" Id. at 10. Thus, plaintiff contends, because the record establishes that he did not receive a hearing, he is entitled to summary judgment. Id. at 10–11.

In their memorandum in support of their motion for summary judgment and in opposition to plaintiff's motion for summary judgment, defendants argue: 1) defendants were not personally involved in the purported constitutional deprivations alleged by plaintiff; 2) plaintiff has offered no evidence to establish the supervisory liability of defendants; 3) defendants' involvement in adverse grievance rulings did not cause or contribute to the purported constitutional violations; 4) alternatively, even presuming defendants were personally involved in plaintiff's loss of privileges, the restrictions placed on plaintiff did not amount to punishment in the constitutional sense; and 5) defendants are entitled to qualified immunity. Defs.' Mem. [D.E. 91] at 10–23.

In response to defendants' motion for summary judgment, plaintiff argues there are genuine issues of material fact because the parties' sworn statements "are squarely contradictory as to what

9

is punishment imposed on the plaintiff a pretrial detainee [sic]." Pl.'s Resp. [D.E. 96-1] at 4. Plaintiff asserts his request for "a hearing as part of the inmate disciplinary report" was denied, and "when he was moved to solitary confinement[,] he was not given any documents in which to waive his right to a hearing and plead guilty or have the hearing the Inmate orientation Manual states will be given to inmates moved to solitary [sic]." Id. at 4–5. Plaintiff contends he wrote "two letters to [Daugherty] and filed a grievance with [Daugherty] and Dawson while he was confined to solitary unit for the relevant March 16 and 23, 2020 disciplinary sanctions that ended May 11, 2020 @2:00 a.m." Id. at 5. Plaintiff claims that Daugherty:

> responded by stating plaintiff failed to timely request a hearing when he was moved to solitary, but policy clearly states the only way to waive a hearing is to plead guilty. The plaintiff never pled guilty and made verbal and written requests for a hearing. Also [Daugherty] and Dawson responded to plaintiff's grievances by stating hearings are not for Rule Violations and no hearing will be given.

Id.

Plaintiff contends, "[t]he sanctions imposed on plaintiff on the relevant dates, no rec, confinement to cell 24 hours for 15 days each incident, no private phone calls, no visits, and no canteen, is clearly imposed with the express intention to punish the Plaintiff [sic]." Id. at 6. Because he received the same sanctions in September 2019 and March 2020, plaintiff disagrees with defendants' claim that raising security concerns played a part in the sanctions imposed. Id.

Plaintiff further argues there is a genuine issue of material fact whether defendants were personally involved the deprivation of his rights because he was not given a hearing for any of these incidents, despite his requests "verbally and in writing to [Daugherty] while he was in solitary confinement for the relevant disciplinary March 16 and 23, 2020." Id. at 7. Plaintiff claims Daugherty's response–that plaintiff had waived his right to a hearing–does not comply with the

10

Jail's policy which states a hearing is only waived when an inmate pleads guilty. Id. at 7–8. Plaintiff further asserts that both Daugherty and Dawson responded, "no hearing will be given and hearings are not for rule violations and this jail follows its policy [sic]." Id. at 8.

Plaintiff also argues that the restrictions imposed were not de minimis, and that defendants are not entitled to qualified immunity because it is clearly established that a hearing must be given when punishment is imposed on a pretrial detainee. See id. at 9–10.

## Discussion

Under the Fourteenth Amendment's Due Process Clause, a pretrial detainee has a right to be free from punishment, Williamson v. Stirling, 912 F.3d 154, 173 (4th Cir. 2018) ("Williamson") (quotation omitted), but "not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." Bell v. Wolfish, 441 U.S. 520, 537 (1979) ("Bell"). A pretrial detainee may raise substantive and procedural due process claims challenging conditions of confinement. Williamson, 912 F.3d at 174–86; see Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997) ("[T]o prevail on either a procedural or substantive due process claim, Inmates must first demonstrate that they were deprived of "life, liberty, or property" by governmental action").

"Typically, a substantive due process claim pursued by a pretrial detainee challenges the general conditions of confinement or the treatment of all detainees in a specific facility." Williamson, 912 F.3d at 174 (citing Slade v. Hampton Roads Reg'l Jail, 407 F.3d 243, 250 (4th Cir. 2005); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988)). By contrast, "[a] pretrial detainee challenging individually-imposed restrictions — as opposed to shared conditions of confinement — is entitled to pursue a procedural due process claim." Id. (citing Dilworth v. Adams, 841 F.3d 246, 250–52 (4th Cir. 2016)).

11

"[J]ail officials are entitled to discipline pretrial detainees for infractions committed in custody and to impose restrictions for administrative purposes without running afoul of *Bell*." Id. at 175 (citation omitted). Nevertheless, "administrative and disciplinary measures also implicate a pretrial detainee's liberty interest in remaining free from punishment," such that "proportional restrictions imposed on a pretrial detainee for a permissible purpose can trigger due process protections, pursuant to *Bell* and the Due Process Clause." Id. (citations omitted).

The level of procedural due process to which a detainee is entitled is contextual, varying "according to whether the restriction was imposed for disciplinary or administrative purposes." Id. Where the restriction is a disciplinary measure, the detainee is entitled to notice of the alleged misconduct, a hearing, and a written explanation of the of the disciplinary action taken. Id. (citing Dilworth, 841 F.3d at 250–52). By contrast, where the restriction is imposed for administrative reasons, to include managerial and security needs, the requisite level of process is diminished. Id. In some instances, however, individualized restrictions, whether disciplinary or administrative, "can be so disproportionate, gratuitous, or arbitrary that it becomes a categorically prohibited punishment that will sustain a substantive due process claim." Id. (citations omitted).

Although "a jail official that seeks to discipline a pretrial detainee must provide the detainee with at least the procedural protections required" by Wolff v. McDonnell, 418 U.S. 539 (1974) ("Wolff"),[12] administrative restrictions instead require procedural protections that comply with the less-demanding standards of Hewitt v. Helms, 459 U.S. 460 (1983) ("Hewitt"),[13] satisfy

---

[12] Wolff held convicted prisoners subject to disciplinary deprivations of liberty or property interests are entitled to advance written notice of charges, a hearing, the right to call witnesses and present evidence when not inconsistent with institutional safety, and written findings by an impartial adjudicator. See Wolff, 418 U.S. at 563–64, 570–71.

[13] Hewitt provides: "an informal, nonadversary evidentiary review [is] sufficient both for the

12

the test announced in Mathews v. Eldridge, 424 U.S. 319 (1976) ("Mathews"),[14] and are subject to periodic review. See Williamson, 912 F.3d at 176–77.

Because plaintiff challenges individualized restrictions for Jail infractions, he raises a procedural due process claim.[15] See id. at 173–74. As noted above, defendants argue, *inter alia*, that they were not personally involved in the alleged deprivation of plaintiff's due process rights.

Daugherty declares the nature and extent of inmate restrictions for violations of Jail policy typically are determined by the shift supervisor of the Jail employee that issued the citation, and that neither Daugherty nor Dawson were personally involved in the imposition of the restrictions that, without a hearing, caused the alleged deprivation of plaintiff's procedural due process rights. See Defs.' App., Ex. 1, Daugherty Aff. [D.E. 93-2] at ¶¶9–13. The record–reflecting that the

---

decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." Hewitt, 459 U.S. at 476.

[14] The Mathews balancing test requires a reviewing court to weigh: the private interests impacted by an official action; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards"; and the government's opposing interests. See Mathews, 424 U.S. at 335.

[15] To the extent plaintiff raises a substantive due process claim, the only injury alleged is denial of due process itself, see Compl. [D.E. 1] at 7, and he makes no showing the imposed restrictions were so "disproportionate, gratuitous, or arbitrary" that they amounted to "categorically prohibited punishment that will sustain a substantive due process claim." Williamson, 912 F.3d at 175; cf. Tate v. Parks, 791 F. App'x 387, 390–91 (4th Cir. 2019) (per curiam) (unpublished) (finding, as in Williamson, "there is evidence that the Tate's circumstances changed materially during his solitary confinement, in ways that might have warranted reconsideration of the restrictions placed upon him.").

13

disciplinary reports imposing restrictions due to plaintiff's relevant infractions were not signed by defendants–supports this declaration. See Pl.'s Resp. Attach., Ex. E [D.E. 96-3] at 10 (Sept. 11, 2019, report); Id., Ex. F [D.E. 96-3] at 11 (Sept. 29, 2019, report), Id., Ex. G [D.E. 96-3] at 12 (Mar. 16, 2020, report), Id., Ex. H [D.E. 96-3] at 12 (Mar. 23, 2020, report); see also Pl.'s Decl., [D.E. 96-3] at ¶¶2–3 (declaring the sanctions were imposed via these inmate disciplinary reports).

Plaintiff, however, argues that his grievances and letters alerted Daugherty and Dawson that the imposition of restrictions without a hearing violated his due process rights. See Pl.'s Resp. [D.E. 96-1] at 7; Pl.'s Decl., [D.E. 96-3] at ¶¶4–9 (declaring: he filed a grievance while in solitary confinement to which Daugherty responded; he filed two letters to which "the Captain" responded; Daugherty and Dawson both responded that there would be no hearing for plaintiff's rule violations; and that these responses failed to grant plaintiff the relief to which he was entitled).

The record indeed reflects that defendants responded to plaintiff's grievances. See Pl.'s Resp. Attach., Ex. B [D.E. 96-3] at 8 (undated note from plaintiff to Daugherty stating plaintiff desired, but was deprived, hearings for infractions, with Daugherty's Apr. 17, 2020, response stating, *inter alia*, "we follow this facility's rules for hearing and disciplinary procedures"); id., Ex. C. [D.E. 96-3] at 9 (Apr. 29, 2020, grievance form stating plaintiff informed Daugherty he was punished through disciplinary measures but received no hearing, but Daugherty responded that rule violations are not subject to a hearing, with Dawson's May 1, 2020, response stating, *inter alia*, that "no hearing will be conducted for these actions"); id., Ex. D, [D.E. 96-3] at 10 (plaintiff's Apr. 15, 2020, note asking why he did not receive hearings for infractions, with Daugherty's Apr. 16, 2020, response, *inter alia*, that plaintiff failed to request a hearing after his secure housing transfer and that no hearings are given for rule violations).

14

Defendant's grievance responses, however, do not themselves violate plaintiff's due process rights. See Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."); see also Booker v. S.C. Dep't of Corr., 855 F.3d 533, 541 (4th Cir. 2017) ("*Adams* establishes a clear rule: inmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process, for example.").

In sum, plaintiff fails to demonstrate either that defendants were personally involved in the imposition of restrictions, without a hearing, due to plaintiff's Jail rule violations, see Williamson, 912 F.3d at 171–72 (affirming summary judgment for two defendants due to their insufficient personal involvement in the deprivation of detainee's due process rights); see also Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (requiring a § 1983 plaintiff to "'affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights'" (citation omitted)), or that a supervisory liability claim lies against defendants under the governing standard, Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994); see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–92 (1978) (finding *respondeat superior* claims not cognizable in § 1983 actions).

After separately reviewing the evidence and reasonable inferences in the light most favorable to the non-moving parties, Scott, 550 U.S. at 378, defendants are entitled to summary judgment as there is no genuine issue of material fact as to their lack of personal involvement in the alleged deprivation of plaintiff's due process rights, Anderson, 477 U.S. at 248–49; Matsushita, 475 U.S. at 587 (finding summary judgment is proper "[w]here the record taken as a whole could

15

not lead a rational trier of fact to find for the nonmoving party." (citation omitted)), but plaintiff has not demonstrated entitlement to judgment as a matter of law, Desmond, 630 F.3d at 354.

Alternatively, as government officials, defendants are entitled to qualified immunity from civil damages if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

Reasonable officials in defendants' positions would not have recognized that their actions–addressing plaintiff's grievances–violated any clearly established rights. See id. at 743; see also Malley v. Briggs, 475 U.S. 335, 341 (1986) ("The *Harlow* standard is specifically designed to . . . permit the resolution of many insubstantial claims on summary judgment . . . .'").

## Conclusion

For the reasons discussed above, the court: GRANTS the motion to amend [D.E. 98]; DENIES AS MOOT the motions to expedite [D.E. 99, 100]; DENIES plaintiff's motion for summary judgment [D.E. 83]; GRANTS defendants' motion for summary judgment [D.E. 90];

16

DISMISSES the complaint; and DIRECTS the clerk to close the case.

SO ORDERED this 28Th day of March, 2023.

*Richard E Myers II*
RICHARD E. MYERS II
Chief United States District Judge

17